AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

|  |  |  |
|---|---|---|
| In the Matter of the Search of | ) | **FILED**<br>**RICHARD W. NAGEL**<br>**CLERK OF COURT** |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | 5/15/20 |
| Unit 300-2000<br>1001 East Second Street<br>Dayton, Ohio | )<br>)<br>) | Case No. 3:20-mj-253<br>Michael Newman | **U.S. DISTRICT COURT**<br>**SOUTHERN DIST. OHIO**<br>**WEST. DIV. DAYTON** |

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Unit 300-2000, 1001 East Second Street, Dayton, Ohio, which is also described and depicted in Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922(g)(1)/924(a)(2) | Possession of a firearm after having been convicted of a felony offense |
| 18 U.S.C. 922(o) | Possession of a machinegun |
| 21 U.S.C. 841(a)(1) and 846 | Distribution/possession with intent to distribute controlled substances, conspiracy |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested

under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Timur J. Housum, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____05/15/2020_____

City and state: _____DAYTON, OHIO_____

Michael Newman
Michael J. Newman
United States Magistrate Judge

## ATTACHMENT A

The location to be searched is Unit 300-2000, located at 1001 East Second Street, Dayton, Ohio (hereinafter **"SUBJECT PREMISES"**). The **SUBJECT PREMISES** is depicted in the photographs below.





## ATTACHMENT B

## ITEMS TO BE SEIZED

1. Books, records, receipts, notes, ledgers, and other documents relating to the possession, acquisition, inventory, and/or sales of firearms.

2. Books, records, receipts, notes, ledgers, money orders, and other records related to the receipt, expenditure and concealment or other disposition of income, which may be maintained in either paper form or on computers, computer disks, CD-ROM disks, DVD disks, portable storage devices, or other related equipment, relating to the failure to maintain proper records by all Federal Firearms Licensee's.

3. Any firearms, ammunition, firearms parts and/or accessories.

4. Any tooling equipment, manuals, or documents related to or capable of converting firearms into machineguns.

5. Any cell phones, computers, and computer storage media (e.g. thumb drives).

6. Any controlled substances, and any items that can be used to grow/assemble, package, distribute, or store controlled substances.

7. Any cash, checks, money orders, jewelry, automobile titles, deeds, or other monetary instruments.

8. Any ledgers, travel documents, receipts, or other documents related to the possession and distribution of controlled substances.

9. Any documents or keys reflecting possessory interest in a property, business, apartment, storage locker, house, or other real estate.

10. Any safes, vaults, or secured storage equipment that could contain any of the above listed items.

**AFFIDAVIT**

I, Timur J. Housum, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent (S/A) in the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been so employed since July of 2015.  As a part of my training with the ATF, I graduated from the Federal Law Enforcement Training Center, Criminal Investigator School, located in Glynco, Georgia.  I also graduated from the ATF Special Agent Basic Training Academy, located in Glynco, Georgia, in February of 2016.  In addition, I was a member of the Dayton, Ohio, High Intensity Drug Trafficking Area (HIDTA) Task Force and am currently assigned to an Organized Crime Task Force, which investigates criminal organizations in the Southern Judicial District of Ohio.

2.      Prior to my employment with ATF, I was an Officer with the Uniformed Division of the United States Secret Service and was employed in this position from February of 2011 through July of 2015. I have received additional training in several areas of law enforcement, including but not limited to Gang investigations, Narcotics interdiction and investigation, and firearms interdiction and investigation.

3.      I submit this affidavit in support of an application for a federal search warrant for evidence of a crime, namely 18 U.S.C. §§ 922(g)(1) and 924(a)(2), that being "Possession of a firearm after having been convicted of a felony offense;" 18 U.S.C. § 922(o), that being "Possession of a machinegun;" and 21 U.S.C. § 841(a)(1) and 846, that being "Possession with intent to distribute and distributing a controlled substance," and conspiracy to do the same.  A

1

"firearm" is defined as, in part, "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). A "machinegun" is defined, in part, as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 18 U.S.C. § 921(a)(23); 26 U.S.C. § 5845(b). Pursuant to 18 U.S.C. § 922(o), it is unlawful to knowingly possess a machinegun. Pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(2), it is also unlawful for a person knowing they have been previously convicted of a felony offense to knowingly possess a firearm.

4.      Affiant submits there is probable cause to believe evidence of the above-listed violations may be found at Unit 300-2000, located at 1001 East Second Street, Dayton, OH 45402 (hereinafter "**SUBJECT PREMISES**"), which is also described and depicted in Attachment A.

5.      This affidavit is intended to show that there is sufficient probable cause for a search warrant for the **SUBJECT PREMISES**, and does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on my personal knowledge, my training and experience, my interviews of various witnesses, including law enforcement personnel who participated in this investigation, and my review of certain records, documents, audio recordings, and video recordings.

6.      Through my role as a special agent, I have participated in the execution of search warrants involving the possession, sale, and use of firearms. I also have personally participated in firearm investigations, many of which involved arrests and/or the use of cooperating sources or confidential informants. Based upon these experiences, I have become familiar with where

2

individuals frequently store firearms and documents relating to the sale or disposition of their

firearms.  In particular, I know:

     a.     that individuals who own or possess firearms frequently store these weapons at their homes/businesses, or out buildings associated with their homes/businesses, such as a garage/shed;

     b.     that individuals who possess firearms often retain or own other items related to firearms, including, but not limited to: gun cases, ammunition, ammunition magazines, holsters, spare parts, cleaning equipment, photographs of firearms, and receipts documenting the purchase of these items;

     c.     that individuals who own or possess guns frequently keep these items for extended periods of time given the durability and expense of firearms;

     d.     that individuals keep or possess in their residences, businesses, other real property and vehicles over which they have dominion and control, documents and items which indicate their occupancy and/or ownership such as:

- personal mail, checkbooks, identification, notes, correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, receipts for vehicle parts and repairs and telephone answering machine introductions.

- cameras and/or digital recording devices and/or containers of undeveloped photographic film, containing photographs (when developed) of themselves occupying the property and vehicles.

     e.     that individuals who sell firearms as a business, either with or without a license, frequently document their sales either in the form of receipts or computerized records; additionally, these individuals typically maintain books, U.S. currency, notes, ledgers, computers, computer disk, pagers, cellular telephones, money orders, IOU's, buyer/seller lists, and other papers, all relating to the sale, transportation, ordering, possession, and/or distribution of firearms.

3

7.      Based on my training and experience, I know that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important aspects: (1) the objects themselves may be instrumentalities, fruits, or evidence of a crime, and/or (2) the objects may have been used to collect and store information about crimes in the form of electronic data.

8.      Based upon my knowledge, training and experience, and the experience of other law enforcement personnel, I know that searches and seizures of evidence from computers commonly require agents to seize most or all computer items (hardware, software, and instructions) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following:

   a.      Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli Drivers, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  The sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site; and

   b.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before the search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure, which is designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code embedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

## ITEMS TO BE SEIZED

9.     A list of specific items to be seized from **SUBJECT PREMISES** is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.

10.     Based on my training and experience, as detailed above, I believe there is probable cause to believe that the items listed in Attachment B may be found in **SUBJECT PREMISES**.

## PROBABLE CAUSE

11.     In July 2019, a confidential informant (hereinafter "CI") working with the Warren County Drug Task Force ("WCDTF") provided information to law enforcement regarding Jordan Carpenter ("CARPENTER"). The CI is working with law enforcement for consideration in a pending criminal case. The CI has provided reliable and actionable information since July 2019, and is currently assisting ATF with a federal criminal investigation. Information provided by the CI has been corroborated throughout the course of ATF and WCDTF investigations. Information provided by the CI, as well as actions of the CI at the direction of WCDTF, have resulted in obtaining physical evidence of federal and state criminal violations. The CI is therefore considered to be truthful and reliable.

12.     In or about July 2019, your Affiant and WCDTF Detective (Det.) Hawk interviewed the CI regarding alleged violations of federal firearm laws by CARPENTER. During the interview, the CI stated that CARPENTER had offered to sell the CI fully automatic rifles for $2,500.00 per firearm. The CI stated that CARPENTER informed the CI that all firearms were built from an AR platform and ranged in calibers from .223, 7.62, and 300 blackout.

5

13.    Your Affiant conducted a records check related to CARPENTER.  The records check revealed that CARPENTER was convicted in July 2014 of Felonious Assault (serious harm) (F2), in the Common Pleas Court of Montgomery County, Ohio, in Case Number 2014 CR 00265.  The termination entry for the case showed that CARPENTER was sentenced to three years of imprisonment for the conviction.

14.    On or about July 31, 2019, ATF, with the assistance of members of WCDTF, conducted an operation, using an undercover officer (UC) and the CI, to purchase from CARPENTER a .223 caliber rifle suspected of being a machinegun for the purchase price of $2,500.00.  The buy took place in the parking lot of Miami Valley Gaming Casino, located at 6000 OH-63, Lebanon, Ohio, on July 31, 2019.  The UC was provided with electronic transmitting/recording devices and prerecorded buy money for the purchase of the suspected machinegun.

15.    A short time later, law enforcement surveillance units observed a white Mercury Sable bearing Ohio plate HMR2214 pull into the parking lot of Miami Valley Gaming Casino and park next to the undercover vehicle.  A records search conducted prior to the operation showed that the white Mercury Sable was registered to CARPENTER. The UC observed CARPENTER exit the Mercury Sable, and walk to the trunk.  The UC visually identified the individual as CARPENTER and observed him (CARPENTER) open the trunk of the Mercury Sable. The UC exited the undercover vehicle and joined CARPENTER at the trunk of the Mercury Sable.  While at the trunk, the UC observed CARPENTER pull the magazine out of the suspected machinegun rifle, wrap the rifle in a gray blanket, and carry it into the rear passenger seat of the undercover vehicle.

6

16.     CARPENTER and the UC then entered the undercover vehicle to complete the transaction. The suspected machinegun rifle that the UC purchased from CARPENTER is further described as a black, American Built Custom (ABC), multi-caliber rifle, model ABC-15, bearing serial number ABC-1353.  While in the undercover vehicle, CARPENTER began talking about guns with the UC. CARPENTER stated he could get anything caliber wise, as small as a 9mm all the way up to an AR10. When the UC complemented the quality of the suspected machinegun that CARPENTER had sold to the UC, CARPENTER stated that the firearm had a free-floating barrel, a red dot scope, and a laser. CARPENTER further stated, "I found a new way to rig these," and then showed the UC how the laser functioned.  The UC handed CARPENTER $2,500.00 in pre-recorded buy money.  CARPENTER took the money and counted it, and confirmed it was $2,500.00.

17.     CARPENTER then stated that the UC could purchase a 7.62 x 39 caliber rifle for the same price, and that the price is more expensive for larger caliber rifles. CARPENTER further stated to the UC, "if you have any problems at all with the rifle let me know" and "bring it back to me and I will have it fixed for free, no problems." CARPENTER provided the UC with the contact number of 937-287-0250 for future business. CARPENTER further stated, "If you buy in bulk, the prices go down," and referenced a number range between 5 to 10 firearms. CARPENTER stated, "soon I will have the ability to make or cut these out of raw steel so they will be blank," and went on to state "the lathe is still being played with but we will have the ability to make entire Glocks and 1911s."  At that time, the UC asked if CARPENTER had made the suspected machinegun rifle that was purchased.  CARPENTER responded that he did not make the suspected machinegun.

7

18.     CARPENTER then picked up the suspected machinegun rifle from the back seat, pushed out the rear take-down pin to expose the internal mechanisms of the firearm, and began explaining the functions of the firearm. CARPENTER stated that the internal components were "M16 internals" and "these are not just shaved and all that stupid bullshit." CARPENTER closed the rifle, pushed in the rear take-down pin, and stated to the UC, "You have total trigger control." CARPENTER went on to show the UC how to rotate the safety selector switch from safe to semi-automatic, and from semi-automatic to fully automatic. A short time later CARPENTER exited the undercover vehicle, and drove off in the Mercury Sable.

19.     A search was conducted of the National Firearms Registration and Transfer Record, the central registry of all restricted weapons, including machineguns. The search showed that the ABC-15 suspected machinegun bearing serial number ABC-1353 sold by CARPENTER to the UC on July 31, 2019, was not registered.

20.     On or about August 8, 2019, your Affiant shipped the suspected machinegun to the ATF Firearms Technology Criminal Branch ("FTCB") for analysis. A Firearms Enforcement Officer confirmed that the ABC-15 rifle-bearing serial number ABC-1353 was an operable firearm and functioned as a machinegun, and that the receiver had traveled in interstate commerce.

21.     On or about August 14, 2019, ATF, with assistance from members of the WCDTF, conducted an operation to purchase a 7.62 caliber suspected machinegun and a Serbian AK-style pistol from CARPENTER for the purchase price of $3,200.00.  The transaction took place in the parking lot of Miami Valley Gaming Casino, located at 6000 OH-63, Lebanon,

Ohio. A short time later, surveillance units observed a dark colored GMC Terrain bearing Ohio plate ERU5191 pull into the parking lot and park two spots away from the undercover vehicle.

22.     Law enforcement surveillance units then observed a male matching the description of CARPENTER exit the front passenger door of the GMC Terrain, walk to the trunk of the vehicle and retrieve a bag. With the trunk still opened, CARPENTER was observed by law enforcement carrying the bag over to the undercover vehicle, where he (CARPENTER) conducted the sale of the firearms to the UC. The firearms purchased from CARPENTER were further identified as: (1) a black, American Built Custom (ABC) multi-caliber rifle, model ABC-15, bearing serial number ABC-1354; and (2) a black with wood finish, Zastava 7.62 caliber pistol, model PAP M92 PV, bearing serial number M92PV071102. The UC confirmed CARPENTER was the individual that conducted the sale of the suspected machinegun rifle and the AK-style pistol. Following the transaction, law enforcement observed CARPENTER return to the passenger side of the GMC Terrain and the vehicle exited the parking lot.

23.     A search was conducted of the National Firearms Registration and Transfer Record, the central registry of all restricted weapons, including machineguns. The search showed that the ABC-15 suspected machinegun bearing serial number ABC-1354 sold by CARPENTER to the UC on August 14, 2019, was not registered.

24.     Your Affiant shipped the suspected machinegun to the ATF Firearms Technology Criminal Branch ("FTCB") for analysis. A Firearms Enforcement Officer confirmed that the ABC-15 rifle-bearing serial number ABC-1354 was an operable firearm and functioned as a machinegun, and that the receiver had traveled in interstate commerce. An Interstate Nexus check confirmed that the Zastava 7.62 caliber pistol, model PAP M92 PV, bearing serial number

9

M92PV071102 was manufactured outside the state of Ohio. A field test conducted confirmed the Zastava 7.62 caliber pistol was an operable firearm.

25. On September 27, 2019, ATF with assistance from members of the WCDTF, conducted an operation to place an order of three .223 caliber rifles suspected of being machine guns from CARPENTER for the purchase price of $3,000.00. The money transfer took place in the parking lot of Field and Stream, located at 10351 Innovation Drive, Miamisburg, Ohio. At approximately 1254 hours, surveillance units observed the dark colored GMC Terrain bearing Ohio plate ERU5191 pull into the parking lot of Field and Stream and park next to the UC's undercover vehicle.

26. Surveillance units observed in the passenger seat of the GMC Terrain a male matching the physical description of CARPENTER, and a female driver. Surveillance units then observed CARPENTER exit the front passenger side of the GMC Terrain, open the passenger door of the UC vehicle, and stand in the opening of the door. At that time, the UC gave CARPENTER $3,000.00 for the manufacturing of three .223 caliber rifles suspected of being machineguns to be completed at a later date. CARPENTER went on to explain the process stating, "So what happens is, I just texted "HIM" (unknown subject) and said hey I have an order for three standard M4's, I bring him the money or whatever." CARPENTER went on to state, "So he's going to the shop right now to talk to his boss to get a price and about how long." After the transaction, surveillance units observed CARPENTER return to the front passenger side of the GMC Terrain and exit the parking lot. The UC confirmed CARPENTER was the individual that conducted the transaction of $3,000.00 for the order of the suspected machineguns.

10

27.     On or about October 25, 2019, while conducting surveillance of CARPENTER, Affiant observed CARPENTER's white Mercury Sable Ohio tag HMR2214 parked in the lot of a warehouse located at 1508 East Second Street, Dayton, OH. A short time later, Affiant observed CARPENTER exit the warehouse, lock the dead bolt of the side door under the awning "GTG" and then walk to the driver side of white Mercury Sable (OH-HMR2214). Surveillance observed CARPENTER on his phone and then a short time later get into the Mercury Sable and drive away.

28.     A records check revealed CARPENTER registered the business Gold Tower Group, LLC and located at 1508 East Second Street, Dayton, OH, on March 18, 2019 with the State of Ohio Office of the Secretary of State.

29.     On October 31, 2019, S/A Housum conducted surveillance of the warehouse leased by CARPENTER at the 1508 East Second Street, Dayton, OH in reference to suspected machine gun manufacturing. Affiant observed the blue Dodge Ram pickup Ohio tag GRT5215 parked in the parking lot. A short time later, Affiant observed a Nissan Rogue later identified by tag (OH-HDH5601) pull into the parking lot of the 1508 East Second Street, Dayton, OH. A white male driver, wearing a brown jacket and black pants, exited the driver side door, walked to the back of the vehicle and took out what appeared to be plastic tubs and entered the warehouse door with the "GTG" awning.

30.     On that same date moments later, Affiant observed a KIA Rio (OH-HTL3121) pull into the parking lot of the 1508 East Second Street, Dayton, OH. A black male driver wearing a red hooded sweatshirt exited the driver side door and entered the warehouse through the door with the "GTG" awning. Later during the surveillance, Affiant observed the same black

11

male wearing a red hooded sweatshirt exit the warehouse and place something in the rear passenger seat of the KIA (OH-HTL3121), and then drove from the parking lot of the 1508 East Second Street, Dayton, OH. The KIA (OH-HTL3121) was stopped for traffic violations, and the driver was identified (hereinafter "E.B"). Police determined E.B was driving under a suspended license. A tow inventory was conducted on the KIA, and officers located a red duffle bag in the rear passenger seat with 8 vacuum sealed bags of suspected marijuana packed inside.

31. Moments later, Affiant observed the white male wearing a brown jacket and black pants exit the warehouse carrying two brown cardboard boxes. The white male loaded the cardboard boxes into the Nissan Rogue (OH-HDH5601) and drove from the parking lot of the 1508 East Second Street, Dayton, OH. A traffic stop was conducted on the Nissan Rogue (OH-HDH5601) after surveillance units observed the driver (hereinafter "A.S.") meet up with a second individual (hereinafter "K.P.") driving a Chevy Trax (OH-HIJ8252), and began loading a box and tub seen at the warehouse into K.P.'s vehicle. A Dayton Police drug dog conducted an open-air sniff and alerted on both the Nissan Rogue and Chevy Trax.

32. A search of the Nissan Rogue resulted in the recovery of two plastic bins and one cardboard box with a total of 12 vacuum-sealed bags of suspected marijuana and approximately $36,990.00 in US currency. A revolver further identified as a Rock Island .38 caliber revolver bearing serial number RIA1848747 was found in the glove compartment of the vehicle.

33. A search of Chevy Trax recovered one plastic tub and one cardboard box with a total of 10 vacuum-sealed bags of suspected marijuana and approx. $2,300.00 in US currency. On that same date after the traffic stops, Affiant observed CARPENTER exit the warehouse carrying nothing in his hands, lock the dead bolt of the side door under the awning "GTG," and

12

then walked to the driver side of the blue Dodge Ram pickup before driving away from the 1508 East Second Street, Dayton, OH.

34.     The suspected marijuana was shipped to the Miami Valley Regional Crime Lab for analysis. The Lab confirmed the items were tested and found to be Cannabis and that the quantitation of each of the items resulted in a delta 9 tetrahydrocannabinol (delta 9-THC) concentration of >0.87% by weight.

35.     On or about December 17, 2019, investigators conducted an operation to obtain three .223 caliber suspected machineguns that were previously ordered and purchased for $3,000.00. At approximately 1453 hours, CARPENTER texted the UC and stated, "Hey so my dude is picking them up but I guess two of them have to be out under a drill press. Do you have one??". While conducting surveillance law enforcement observed a black GMC pickup bearing Ohio tag GSG9636 park in front of 15 Mello Avenue apartment complex located in Dayton Ohio. A records check revealed the GMC pickup was registered to a person hereinafter referred to as "C.C." At approximately 1516 hours, law enforcement observed C.C. get out of the driver compartment, opened the door to look into the back seat and then proceed to hop back into the driver seat. A short time later surveillance units observed CARPENTER appear from 15 Mello Avenue apartments and enter the front passenger side of the black GMC pick-up (OH-GSG9636). Law enforcement proceeded to follow CARPENTER and C.C. in the black GMC pick-up away from Mello Avenue.

36.     At approximately 1522 hours, UC received a phone call from CARPENTER. CARPENTER stated, "So I'm taking em to the guy to get em converted and I wanna hear what he is talkin about." CARPENTER went on to state, "I haven't looked at them yet I got em in the

truck but uh, I don't care if it's an hour I can drive it, I don't know how long it's gonna take but I'll get it done tonight." At approximately 1610 hours, surveillance observed the black GMC pick-up (OH-GSG9636) pull into the parking lot of 1508 East Second Street, Dayton, OH. Law enforcement observed CARPENTER, C.C., and a third white male exit the vehicle and enter the warehouse carrying a bag. At approximately 1625 hours, CARPENTER texted the UC and stated, "Found the press waiting for the ok then heading to get this knocked out." A short time later, CARPENTER texted the UC and stated, "We got the ok so we are going now." Law enforcement observed CARPENTER, C.C., and the white male exit the warehouse and enter the black GMC pick-up (OH-GSG9636). Prior to entering the vehicle surveillance units observed CARPENTER on the phone carrying a cardboard box in his hand to the front passenger side of the vehicle. Moments later surveillance units observed the GMC pickup exit the 1508 East Second Street, Dayton, OH parking lot

37.     Later on December 17, 2019, CARPENTER contacted the UC and stated he just found out that his guy had not ordered the parts to complete the suspected machine guns. CARPENTER agreed to still meet with the UC later in the evening and give him the $3,000.00 dollars back for the order of the firearms to hold on to until the firearms were completed.

38.     On or about December 17, 2019 at approximately 1844 hours, surveillance units observed the black GMC pick-up (OH-GSG9636) pull into the parking lot of Field and Steam. Moments later surveillance units observed CARPENTER exit the front passenger side of the black GMC pickup and enter the UC vehicle. CARPENTER made contact with the UC to return $3,000.00 that was fronted for the order of the three-suspected machine guns. CARPENTER stated, "Found a dude with a fuckin drill press and another dude with a lathe", "He's pretty good

14

with metal, so I'm gonna have my fabricator just pretty much give this guy the dimensions."
CARPENTER went on to state, "Not the guy I'm currently workin with." CARPENTER further
stated, "I'll be able to pull stuff off the street with no background checks, nice stuff like Daniel
Defense stuff, Noveske like really high end shit and then just totally fabricate it all the way
through. CARPENTER went on to explain about the order getting messed up, stating, "This dude
just fucked off my money." CARPENTER stated, that when the parts come in he will contact the
UC and set up a time to deliver the three suspected machine guns.

39.     Later in the conversation, CARPENTER asked if the UC had any contacts in the
drug area stating, he had over 7100 Xanax bars that he heard went for around ten to twelve
dollars a bar out in the county. CARPENTER further stated, "In the city I charge three dollars".
CARPENTER stated he had a contact with Adarall and "blow" (slang for Cocaine) and further
stated, "I been tryin to get out to what I call sub-rural communities for like a minute now, like
Lebanon and Germantown." CARPENTER also stated he had a connect on "Ice" (slang for
potent methamphetamine), stating "If you wanna go the ice route, I know some dudes that I
mean Im talkin crysta-al clear….this comes from real labs." The UC agreed to ask around and
the meet concluded shortly after. Surveillance units observed CARPENTER return to the front
passenger seat of the black GMC pick-up (OH-GSG9636) and exit the parking lot.

40.     On or about February 4, 2020, ATF with the assistance from members of the
Warren County Drug Task Force conducted an undercover meeting with CARPENTER. The
meet took place at "Firebirds Wood Fired Grill" in Miamisburg, Ohio. At approximately 1305
hours, CARPENTER met the UC at Firebirds for the meeting. Surveillance units identified the
blue Dodge Ram pickup parked in the front row near Firebirds Wood Fired Grill. During the

15

undercover meeting, the UC asked CARPENTER if he still had the three-suspected machine guns previously discussed. CARPENTER stated "Yeh, yeh, yeh" CARPENTER further stated, "I have to go to Home Depot and get a thing that attaches to a drill press that I can slide side to side", and went on to state, "The company where I was buying those lowers stopped making them like that". CARPENTER further stated, "They (ABC Rifle Company) started fattening the metal where the gear (internals) goes in". CARPENTER went on to state, "So I found out you can order as many as you want cause it's not a gun". CARPENTER stated, "What I can do is if you have a friend or something he can order like 50", and further stated, "What I can do then is go to the street and buy the nicer stuff like the Daniels, Noveske's, and Bushmasters", and further stated "If I buy stuff like that now there's no uh, it's essentially untraceable".

41.     During the conversation, CARPENTER asked the UC if the UC had any friends that were into militia-type stuff, and if they could get their hands on explosives or other stuff. The UC stated that all kinds of things happen at the farm to which CARPENTER stated he would like to come down and meet the UC's contacts. CARPENTER went on to state, "I got friends in Chicago like some real street people and they will pay whatever", in reference to firearms. CARPENTER stated, "Guys in Chicago will pay $700.00 all day for Glocks" and that there is "An even bigger market for smaller caliber revolvers like .22's, .32's, .38's and anything with 3 inch barrels or smaller all day". The meet concluded shortly thereafter, and surveillance units observed CARPENTER enter the blue Dodge Ram pickup and drive it from the parking lot.

42.     On the same date February 4, 2020, after the completion of UC meet, ATF surveillance units conducted mobile surveillance of the blue Dodge Ram pickup. Upon exiting the parking lot of Austin's Landing, surveillance units observed the blue Dodge Ram pickup

16

heading north on Interstate 75 and merge on to Interstate 675 traveling eastbound. Later during the surveillance, investigators observed the blue Dodge Ram pickup pull in front of the building housing the **SUBJECT PREMISES**, and observed CARPENTER enter the rental/leasing office of the building. At approximately 1421 hours, units observed CARPENTER in blue Dodge Ram pickup park near the carport of 1508 East Second Street, Dayton, OH. At approximately 1424 hours surveillance observed CARPENTER exit the blue Dodge Ram pickup and enter the 1508 East Second Street, Dayton, OH from a side door near the carport.

43.     On March 10, 2020 at approximately 1438 hours, Affiant observed the blue Dodge Ram pickup and C.C.'s black GMC pickup Ohio tag GSG9636 parked in the lot of the warehouse located at 1508 East Second Street warehouse. Moments later, surveillance observed CARPENTER and C.C. exit the warehouse. C.C. was observed carrying a duffle style bag and placed it in the trunk of his GMC pickup (GSG9636) before hopping in the driver compartment. Both CARPENTER and C.C. exited the 1508 East Second Street warehouse parking lot in the GMC pickup.

44.     On May 5, 2020, Affiant observed CARPENTER and the blue Dodge Ram pickup located at 1508 East Second Street, Dayton, OH. CARPENTER was observed operating and later exiting the blue Dodge Ram pickup and entering the warehouse.

45.     On May 7, 2020, ATF Special Agents, Ohio State Patrol (OSP), and Warren County Drug Task Force (WCDTF) arrested CARPENTER pursuant to an arrest warrant at a residence located at 2533 Circleview Drive, OH 45419. The blue Dodge Ram pickup was parked in the driveway of the same residence, and was later towed to the Dayton Police Department impound lot located at 417 East Helena Street, Dayton, OH. During a search of 2533 Circleview

17

Drive, an additional .38 caliber revolver, mason jars containing suspected marijuana, and approximately 1,097 grams of suspected Xanax bars were recovered from inside the home, which the homeowner indicated belonged to CARPENTER. While searching the 1508 East Third Street warehouse, two vehicles were found parked inside. One of the vehicles contained - based on Affiant's training and experience and the smell/appearance of the substance - what appeared to be several pounds of vacuum sealed marijuana. The odor of marijuana was also present in the second vehicle.

46.    After CARPENTER was arrested, he was interviewed at the Dayton Police Department, located at 335 W. Third Street, Dayton, OH 45402. Your Affiant and SA Christopher Reed conducted a post-*Miranda* audio/video recorded interview with CARPENTER. During the interview, CARPENTER admitted to be currently using and operating the blue Dodge Ram pickup GRT5215.

47.    On May 14, 2020, Affiant executed a search warrant for the blue Dodge Ram pickup CARPENTER had acknowledged and was observed operating during the investigation. While conducting a search of the vehicle, Affiant located a rental statement from February 4, 2020 addressed to CARPENTER for the **SUBJECT PREMISES**, located within the Front Street Building CO., located at 1001 East Second Street, Dayton, OH (which is within the Southern District of Ohio). On the same date, Affiant made contact with the building manager from the Front Street Building CO. The manager confirmed that CARPENTER had rented a unit in his complex since October of 2019, which was located in building 300, unit number 2000. The manager provided a rental agreement signed by CARPENTER as the sole tenant of the unit. A

18

review of rental statements showed that CARPENTER's last payment for rent was paid in cash and received on May 7, 2020.

48.     In summary, a confidential informant identified CARPENTER as a seller of machineguns. CARPENTER, a convicted felon, has sold three operable firearms to an undercover officer working with ATF on two separate occasions, namely July 31, 2019 and August 14, 2019. Two of these firearms were determined to be machineguns. Based on CARPENTER's comments to the UC, it appears he is working with others to assemble machineguns like those sold to the UC. As recently as February 4, 2020, CARPENTER told the UC that he was planning to continue assembling guns, bragged about selling guns in Chicago, and sought the UC's help in connecting with "militia-type" persons from whom he apparently hopes to obtain explosives. On that same day CARPENTER was observed entering **SUBJECT PREMISES**' leasing office, and later confirmed to be paying rent for **SUBJECT PREMISES**. CARPENTER has been observed meeting with individuals at the 1508 East Second Street warehouse and exchanging items with them. CARPENTER has told the UC as recently as late December, 2019, that he is engaged in drug trafficking, and sought the UC's help in selling his product. On October 31, 2019, two individuals were stopped immediately after leaving the 1508 East Second Street warehouse, and were collectively found in possession of large quantities of cash and marijuana. Based on these facts, it appears that CARPENTER is engaged in drug trafficking activity and the ongoing production and sale of firearms, including machineguns, and has been so for at least the past several months. Moreover, drugs and a firearm alleged by the homeowner to belong to CARPENTER were recovered from 2533 Circleview Drive, which is where CARPENTER was arrested. Additionally, drugs and firearm components were found in

the 1508 East Second Street warehouse rented by CARPENTER. In part because of CARPENTER's ongoing and lengthy drug and firearm trafficking activity, his ties and the activity that has been observed at the 1508 East Second Street warehouse, his continual cash payment of rent of **SUBJECT PREMISES**, that drugs and firearms have already been located at two locations associated with CARPENTER (including a rented structure like the **SUBJECT PREMISES**, namely the 1508 East Second Street warehouse rented by CARPENTER), and Affiant's experience and training regarding the conduct of drug and firearm offenders, Affiant asserts there is probable cause to believe that evidence, instrumentalities and/or the proceeds of illegal firearm and narcotic possession/sales may be stored in **SUBJECT PREMISES**. Affiant requests a search warrant for the **SUBJECT PREMISES** to search for the items listed in Attachment B.

Further affiant sayeth naught.

Timur J. Housum
Special Agent, ATF
Dayton, OH

Sworn to and affirmed before me on May 15, 2020.

HO
UN
Michael J. Newman
United States Magistrate Judge

**2:52 PM, May 15, 2020**

20

**Via electronic means.**